**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEW ENGLAND DEACONESS HOSPITAL, | |
| Plaintiff, | |
| v. | Civil Action No. 09-1787 (BAH) |
| KATHLEEN SEBELIUS, *in her official capacity as U.S. Secretary of Health and Human Services*, | Judge Beryl A. Howell |
| Defendant. | |

**<u>MEMORANDUM OPINION</u>**

  This case concerns whether the plaintiff, New England Deaconess Hospital

("Deaconess"), a former healthcare provider and participant in the Medicare program, received

appropriate reimbursement from Medicare for the depreciation of assets that it used to treat

Medicare patients.  Following the plaintiff's statutory merger with another healthcare provider,

the plaintiff sought reimbursement from Medicare for what the plaintiff asserted was a loss that it

incurred due to the depreciation of its Medicare assets that was almost $8.5 million dollars more

than what Medicare had originally estimated.  After a multi-tiered administrative proceeding, the

defendant Secretary of the U.S. Department of Health and Human Services ("the Secretary")

denied the plaintiff's reimbursement claim, which over the course of the claim proceedings grew

to an estimated $15–20 million, concluding that the loss was not allowable because the statutory

merger did not involve an arm's length transaction between unrelated parties for reasonable

consideration, with each party acting in its own self-interest.  The plaintiff challenges the

Secretary's ruling[1] on the grounds that it was arbitrary, capricious, an abuse of discretion,

---

[1] Although the decision at issue was technically made by the Administrator of the Centers for Medicare and Medicaid Services, that decision was made "on behalf of the Secretary."  *See Whidden Mem'l Hosp. v. Sebelius*, 828

otherwise not in accordance with law, and unsupported by substantial evidence.[2]  Both parties

have moved for summary judgment.[3]

## I.  BACKGROUND

This is an administrative law case, and so the Court will begin by discussing the statutory

and regulatory framework underlying the agency's decision.  The Court will then summarize the

factual circumstances of the plaintiff's statutory merger and the history of the agency

adjudication at issue before addressing the merits of the plaintiff's claim.

### A.  Statutory and Regulatory Framework

#### 1.  *Medicare Reimbursements Generally*

Medicare is a federal program that pays for health care services furnished to eligible

beneficiaries—generally individuals over 65 and individuals with disabilities.  *See* Pl.'s

Statement of Material Facts ("Pl.'s Facts") ¶ 1, ECF No. 17; *see also* 42 U.S.C. § 1395c.  *See*

*generally* CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE & YOU (2012), *available at*

http://www.medicare.gov/pubs/pdf/10050.pdf.  The Centers for Medicare and Medicaid Services

("CMS"), formerly known as the Health Care Financing Administration,[4] is the component of

the Department of Health and Human Services ("HHS") that administers the Medicare program.

*See, e.g.*, *St. Elizabeth's Med. Ctr. v. Thompson*, 396 F.3d 1228, 1230 (D.C. Cir. 2005).  The

---

F. Supp. 2d 218, 222 (D.D.C. 2011).  Therefore, the Court will refer to the challenged decision as "the Secretary's decision" throughout this Opinion.

[2] The Court has jurisdiction over this case pursuant to 42 U.S.C. § 1395oo(f)(1), which provides for federal judicial review of final agency decisions regarding Medicare reimbursement disputes, pursuant to the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

[3] The plaintiff has requested oral argument on the pending motions.  *See* Pl.'s Mot. for Summ. J. at 2, ECF No. 17. The Court concludes in its discretion, however, that the issues have been amply briefed in both motions and that a hearing for oral argument is therefore unnecessary.  *See* LCvR 7(f).  As a result, the plaintiff's request for oral argument is denied.

[4] The agency was renamed the CMS in 2001.  *See* Press Release, U.S. Dep't of Health & Human Servs., The New Centers for Medicare & Medicaid Services (CMS) (June 14, 2001), *available at* http://archive.hhs.gov/news/press/2001pres/20010614a.html.  For the purpose of clarity, the Court will refer to the agency throughout this Opinion as the CMS.

CMS reimburses healthcare providers[5] for, among other things, "the reasonable cost" of the services they provide to Medicare beneficiaries. *See* 42 U.S.C. § 1395f(b)(1). The Medicare Act defines "reasonable cost" as "the cost actually incurred, excluding therefrom any part of the incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations" promulgated by HHS. *Id.* § 1395x(v)(1)(A).

Providers submit claims (also known as "cost reports") for reimbursement to a series of private "Medicare administrative contractors" (also known as "fiscal intermediaries"), who, among other functions, process claims and reimburse providers on behalf of Medicare. *Id.* § 1395kk-1. If a provider disagrees with a fiscal intermediary's reimbursement decision, the provider may appeal the decision to the Provider Reimbursement Review Board ("PRRB"), which is a five-member body appointed by the Secretary. *See id.* § 1395oo. At her discretion, the Secretary may reverse, affirm, or modify any PRRB decision. *Id.* § 1395oo(f); *see also* 42 C.F.R. § 405.1875. The Secretary's decision (or, if the Secretary takes no action, the PRRB's decision) constitutes a final agency action, and a provider has the right to challenge such a decision in federal district court within sixty days of issuance. *See* 42 U.S.C. § 1395oo(f).

### 2. *Reimbursement for Asset Depreciation*

The Medicare regulations state that the program will reimburse a provider for, *inter alia*, Medicare's share of "capital-related costs," which include the depreciation of any of the provider's buildings and equipment that are used to treat beneficiaries. *See* 42 C.F.R. §§ 413.130, 413.134(a). The rationale for such reimbursement is that depreciation reflects part of the "the cost actually incurred" by the provider in treating beneficiaries. *See* 42 U.S.C. 1395x(v)(1)(A); 42 C.F.R. § 413.5 (outlining principles of reimbursement for "allowable costs,"

---

[5] The Medicare Act defines "provider of services" as "a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health care agency, hospice program, or, for purposes of [other provisions] of this title, a fund." *See* 42 U.S.C. § 1395x(u).

including depreciation).  To determine how much Medicare reimburses a provider for depreciation, the depreciating asset's historical cost—*i.e.*, the cost to the provider of initially obtaining the asset, *see* 42 C.F.R. § 413.134(b)(1)— is first pro-rated over the estimated useful life of the asset.  *See id.* § 413.134(a).[6]  Once the asset's overall estimated annual depreciation is calculated, Medicare reimburses the provider for the percentage of Medicare's share of that estimated annual depreciation, which is equal to the percentage of the asset used that year to treat beneficiaries. *See id.* § 413.134(a)(2)–(3); *see also St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 901 (D.C. Cir. 2010) ("[T]he annual reimbursable allowance is equal to the actual cost divided by the number of years of its useful life and then multiplied by the percentage of the asset's use devoted to Medicare services in the given year.").  An asset's historical cost, less its cumulative estimated depreciation, is known as its "net book value."  *See* 42 C.F.R. § 413.134(b)(9).

Annual estimated depreciation (also known as an "allowance for depreciation," *see id.* § 413.134(a)), however, is just that—an estimate.  Thus, any reimbursement based on that estimate is also necessarily an estimate.  For this reason, the Medicare Act requires that "retroactive corrective adjustments" be made where "the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive."  *See* 42 U.S.C. § 1395x(v)(1)(A).  An estimate "proves to be either inadequate or excessive" when a more accurate measure of depreciation can be ascertained.  As a general matter, a change in ownership can provide a more accurate measure of depreciation, insofar as the change in ownership reflects

---

[6] This calculation can generally be done through one of three methods: (1) the "straight-line method," under which the salvage value of an asset is subtracted from its historical cost, and then that amount is distributed in equal amounts over the period of the estimated useful life of the asset; (2) the "declining balance method," under which the annual depreciation allowance is computed by multiplying the undepreciated cost of the asset each year by a uniform rate; or (3) the "sum of the years' digits method," under which the annual depreciation allowance is computed by multiplying the depreciable cost basis (*i.e.*, historical cost minus salvage price) by a constantly decreasing fraction, the numerator of which is the number of years remaining in the useful life of the asset, and the denominator of which is the sum of the years' digits of the useful life at the time of acquisition.  *See* 42 C.F.R. § 413.134(b)(3)–(5).  The method of calculating the annual depreciation allowance is not at issue in this case.

the true "fair market value" of the asset.  An asset's fair market value is "the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition."  *See* 42 C.F.R. 413.134(b)(2).  In other words, fair market value is the price an asset would sell for in an arm's length, open-market transaction.  Hence, when an asset is sold in such a market transaction, and the fair market value turns out to be more or less than the net-book value, a retroactive corrective adjustment is required.  If the sales price is less than the estimated remaining value of the asset, then the annual estimated depreciation payments would have underestimated the amount of depreciation, and the provider would be entitled to additional reimbursement to account for Medicare's share of the decline in the asset's value.  If, however, the sales price is more than the estimated remaining value of the asset, then Medicare would have overestimated the asset's depreciation, and it would recapture the excess depreciation paid to the provider.  *See, e.g.*, *Forsyth Mem'l Hosp., Inc. v. Sebelius*, 639 F.3d 534, 536 (D.C. Cir. 2011); Pl.'s Mem. in Supp. Mot. for Summ. J. ("Pl.'s Mem.") at 3 n.4, ECF No. 17.  Such adjustments ensure that only "the cost actually incurred" by a provider is reimbursed—no more, no less.  *See* 42 U.S.C. 1395x(v)(1)(A).

### 3. *Depreciation Recalculations Involving Mergers*

Until 1997, the Medicare Act and its implementing regulations permitted retroactive corrective adjustments for any gain or loss in depreciation costs realized as a result of a change in ownership of an asset.  *See* 42 C.F.R. § 413.134(f) (1996).  During the 1990s, however, changes in economic conditions, together with changes in the health care industry, caused sales and mergers of assets to result in an increasing number of depreciation losses, rather than gains, which in turn resulted in an increasing financial burden on the Medicare program.  *See* Pl.'s Facts ¶ 35.  *See generally* OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS.,

MEDICARE LOSSES ON HOSPITAL SALES (1997), *available at*

https://www.oig.hhs.gov/oei/reports/oei-03-96-00170.pdf (estimating that Medicare would lose

$512 million in depreciation adjustments for hospitals sold between 1990 and 1996).  Due

primarily to this increasing financial burden, Congress amended the Medicare Act to eliminate

the possibility of being reimbursed for gains or losses arising out of a change in ownership.  *See*

Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404, 111 Stat. 251, 400.

This amendment was only prospective, however, *see* 111 Stat. at 400, and thus it does not

apply to any changes in ownership that took place prior to December 1, 1997.  *See* 42 C.F.R.

§ 413.134(f)(1).  Since the change in ownership at issue in the instant case took place before

December 1, 1997, the pre-1997 regulations regarding depreciation reimbursement for changes

in ownership apply.  Those pre-1997 regulations established that, if a Medicare provider merged

with another entity under state law, the surviving entity would be eligible for reimbursement on

any loss (or gain) realized as a result of depreciation of the merged provider's Medicare assets.

*See* 42 C.F.R. § 413.134(f), (*l*)(2) (1996).  As the CMS explained when promulgating this

regulation in 1979, in the context of a statutory merger "the merged corporation ceases to exist as

a corporate entity" and thus "there has indeed been a transfer of ownership and a revaluation is

proper."  *See* Effect of Capital Stock Transactions, 44 Fed. Reg. 6912, 6913 (Feb. 5, 1979).

"Under the depreciation regulation, an asset's gain or loss is equal to the difference between the

consideration received upon disposition and its 'net book value' . . . ."  *St. Luke's*, 611 F.3d at

901–02 (citing *Lake Med. Ctr. v. Thompson*, 243 F.3d 568, 569 (D.C. Cir. 2001)).

To ensure that only "the cost actually incurred" by a provider is reimbursed, however, the

CMS has interpreted its regulations to require that, before depreciable assets may be revalued

and the resulting losses reimbursed following a statutory merger of non-profit entities, the

merger must satisfy certain criteria to ensure that the transaction reflects the true fair-market

value of the assets.  In particular, the CMS has interpreted its regulations to require that (1) "the

merger or consolidation must occur between or among parties that are not related as described in

the regulations at 42 CFR 413.17," and (2) "the transaction must involve one of the events

described in 42 CFR 413.134(f) as triggering a gain or a loss recognition by Medicare."  *See*

Health Care Fin. Admin., Clarification of the Application of the Regulations at 42 CFR

413.134(l) to Mergers and Consolidations Involving Non-profit Providers, Program

Memorandum A-00-76 ("PM A-00-76"), at 2 (Oct. 19, 2000) (reissued as PM A-01-96); *see also*

42 C.F.R. § 413.134(f) (providing for reimbursement in the event of "sale, scrapping, trade-in,

exchange, demolition, abandonment, condemnation, fire, theft, or other casualty").

As to the second requirement, the CMS's guidance explains that, typically, the event

described in 42 C.F.R. § 413.134(f) that takes place in a non-profit merger or consolidation is a

"*bona fide* sale, as defined in the [Provider Reimbursement Manual] at § 104.24, because a

merger or consolidation could, but usually does not, involve a scrapping, demolition,

abandonment, or involuntary conversion."  *See* PM-A-00-76 at 2; *see also id.* at 3

("Notwithstanding the treatment of the transaction for financial accounting purposes, no gain or

loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted

from a *bona fide* sale as required by regulation 413.134(f) and as defined in the PRM at

§ 104.24.").  The Provider Reimbursement Manual, in turn, states that "[a] bona fide sale

contemplates an arm's length transaction between a willing and well-informed buyer and seller,

neither being under coercion, for reasonable consideration.  An arm's length transaction is a

transaction negotiated by unrelated parties, each acting in its own self interest."  *See* CMS,

Provider Reimbursement Manual ("PRM") § 104.24.  Consistent with this definition, in

evaluating whether a *bona fide* sale has occurred, the CMS's guidance states that "a comparison of the sales price with the fair market value of the assets is a required aspect," and "reasonable consideration is a required element." *See* PM A-00-76, at 3.  With regard to "reasonable consideration," the guidance provides that "a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a *bona fide* sale." *Id.*  Finally, the guidance states that "a review of the allocation of the sales price among the assets is appropriate," and "[i]f a minimal or no portion of the sales price is allocated to the fixed (including the depreciable) assets a *bona fide* sale of those assets has not occurred."  *Id.* at 4.

### B.   **Factual and Procedural Background**

In 1996, Deaconess was a 385-bed non-profit, tertiary care surgical teaching hospital affiliated with Harvard Medical School and located in Boston, Massachusetts.  Admin. Record ("A.R.") at 21, 26 n.34, ECF No. 12.[7]  Deaconess was a referral hospital that specialized in the treatment of vascular diseases, but it did not offer any pediatric, gynecological, obstetric, or primary care services.  *See id.* at 1404.  As the health-care market changed in the 1980s and early 1990s, and "managed care" became the norm, specialty referral hospitals like Deaconess began to suffer financially because they did not have sufficient patient flow to maintain adequate operating revenues.  *See id.* at 1404–05.  Additionally, Deaconess in particular was suffering financially because its buildings (primarily constructed in the 1950s through 1970s) were aging, and it had considerable debt.  *Id.* at 58–59.  As a result, by the early 1990s, it had become clear that if Deaconess did not find another healthcare provider with which to form some type of alliance or merger, Deaconess would go out of business within a matter of a few years.  *See id.* at 58, 1237–39.

---

[7] Since the Administrative Record in this case is quite voluminous, comprising nearly 6000 pages, it was filed with the Court on a CD, and it is on file with the Clerk of this Court.  *See* Notice of Filing of Administrative Record, ECF No. 12.

That is where Beth Israel Hospital Association ("Beth Israel") came into the picture.[8]

Beth Israel was a teaching and research hospital that, unlike Deaconess, had a large base of

primary care patients and offered a wide range of health care services.  *See* A.R. at 1243.  Beth

Israel, like Deaconess, was affiliated with Harvard Medical School and, in fact, was located

across the street from Deaconess.  *See id.*  Deaconess and Beth Israel consummated a statutory

merger on October 1, 1996, at which point Deaconess ceased to exist.  *Id.* at 21.[9]  As a result of

the merger, Beth Israel changed its name to Beth Israel Deaconess Medical Center, Inc.

("BIDMC").  *Id.*  Under the relevant terms of the merger agreement, BIDMC assumed all of

Deaconess's liabilities, totaling approximately $251 million, in consideration for BIDMC

acquiring all of Deaconess's assets, with a net-book value of approximately $355 million.[10]  *See*

*id.* at 24.  Approximately $212 million of Deaconess's assets were depreciable assets and land

(*i.e.*, "fixed" assets), and the remaining $143 million consisted of current monetary assets

---

[8] In 1994, prior to entering into merger negotiations with Beth Israel, which culminated in the merger on October 1, 1996, Deaconess had approached another teaching hospital in Boston called New England Medical Center ("NEMC") regarding a possible merger.  *See id.* at 1240–41.  After six months of negotiations, however, the talks collapsed in the summer of 1995.  *Id.* at 1241–42; *see also id.* at 2273 (*Boston Globe* reporting that the negotiations "appeared to die of a thousand cuts" due to "a slew of hurdles").

[9] The Secretary of the Commonwealth of Massachusetts issued a Certificate of Merger on October 1, 1996, certifying the filing of the Articles of Merger.  *See* A.R. at 2010; *see also* MASS. GEN. LAWS ch. 180, § 10.  The plaintiff misleadingly states that the Massachusetts Attorney General "approv[ed] of the transaction."  *See* Pl.'s Facts ¶ 85; Pl.'s Mem. at 7.  There is no evidence in the record that the Massachusetts Attorney General ever formally approved of the Deaconess-Beth Israel merger.  The document cited by the plaintiff in the Administrative Record for its statement regarding the Massachusetts Attorney General's action appears to be an informal guidance document authored by a Massachusetts Assistant Attorney General.  This document states that non-profit mergers (*i.e.*, mergers involving "public charities") under Massachusetts law only require notice to the Attorney General "if a particular merger will lead to a material change in how pre-existing assets are applied."  *See* A.R. at 3089; *see also* MASS. GEN. LAWS ch. 180 § 8A (requiring "[a] corporation constituting a public charity" to give prior notice of any "sale, lease, exchange or other disposition" of corporate assets to Attorney General "if that sale, lease, exchange or other disposition involves or will result in a material change in the nature of the activities conducted by the corporation").  Indeed, the guidance document further states that "the routine [non-profit merger or consolidation] does not require Attorney General involvement" and "[t]he statutory process for this type of structural change is self-executing."  *See* A.R. at 3089–90.  Thus, there is no support for the plaintiff's assertion that the Massachusetts Attorney General "considered the relationship of the parties and the arm's length nature of their dealings."  *See* Pl.'s Mem. at 7, 54.

[10] There is a dispute between the parties regarding the value of Deaconess's assets, to which the Court will return below.

(including cash and cash equivalents).  *Id.*  For accounting purposes, BIDMC treated

Deaconess's assets as a "pooling of interests," rather than combining them via the "purchase

method."  *See id.* at 18, 25.  This essentially meant that BIDMC used the net-book value of the

assets on its balance sheet, rather than trying to revalue the assets at their fair-market value.  *Id.*

Additionally, neither party to the merger sought an appraisal of Deaconess's assets prior to the

consummation of the merger, *see id.* at 1427, and at no time did Deaconess ever attempt to sell

its assets, *see id.* at 22.

      Following the merger, Deaconess filed a terminating cost report with its Medicare fiscal

intermediary in April 1997.  *See, e.g.*, A.R. at 1425–26.  In that initial cost report, Deaconess did

not claim any loss as a result of the merger.  *Id.* at 1425.[11]  On August 31, 1998, however,

Deaconess filed an amended terminating cost report, claiming an approximately $8.37 million

loss as a result of the merger.  *See id.* at 854 ¶ 6.  On September 29, 1998, Deaconess's fiscal

intermediary, Associated Hospital Service of Maine, issued a Notice of Program Reimbursement

("NPR") disallowing Deaconess's claimed loss.  *See id.* at 854 ¶ 6, 5919.

      On March 25, 1999, Deaconess timely appealed the fiscal intermediary's decision to the

PRRB.  *Id.* at 5919, 5921.  The hearing before the PRRB was initially set for May 2001, *see id.*

at 5918, but for reasons not fully explained in the Administrative Record, Deaconess's hearing

before the PRRB did not take place until almost six years later, on February 28 and March 1,

2007, *see id.* at 1379–482.  By that time, Deaconess had engaged a valuation firm called CBIZ

Valuation, Inc. ("CBIZ") to perform a retrospective appraisal of the fair-market value of

Deaconess's depreciable assets at the time of the merger.  *See id.* at 1876; *see also id.* at 148–839

---

[11] The reason for Deaconess's failure to claim a loss on its initial terminating cost report is unclear.  When asked in the PRRB hearing why no loss was reported, the Director of Reimbursement and Revenue Analysis for BIDMC testified that he did not know why no loss was claimed, stating "we just didn't address it."  *See* A.R. at 1421, 1425. In its statement of facts, the plaintiff claims that it "was unaware of the loss."  *See* Pl.'s Facts ¶ 117.

(text of the appraisal). CBIZ completed this appraisal in February 2007, and the appraisal estimated that, as of October 1, 1996, Deaconess's depreciable assets (*i.e.*, lands, buildings, site improvements, furniture, fixtures, and equipment) had a fair-market value of $178,250,000, *see id.* at 150, which was approximately $34 million less than the net-book value of those assets at the time of the merger. In light of this retrospective appraisal, Deaconess once again changed the amount of the loss it was claiming. This time, Deaconess claimed that it had suffered a loss of either $15.5 million or $19 million, depending upon the method of calculation. *See id.* at 1878.[12] On May 29, 2009, PRRB reversed the fiscal intermediary's decision, concluding that "[t]he Intermediary's adjustment disallowing [Deaconess]'s claimed loss . . . was contrary to the regulatory requirements of 42 C.F.R. § 413.134(l)(2)(i)" and "[t]he allocation of the consideration to the merged assets should be performed based on [Deaconess]'s submitted appraisal using the pro-rata method discussed at 42 C.F.R. § 413.134(f)(2)(iv)." *See id.* at 60. This would result in a reimbursement of approximately $15.5 million. *See, e.g., id.* at 1878.

On June 12, 2009, the Administrator of the CMS, on behalf of the Secretary, notified Deaconess and the fiscal intermediary that, on her own motion, the Administrator would be reviewing the PRRB's decision to reverse the fiscal intermediary. *See id.* at 38–39. On July 24, 2009, the Administrator of the CMS issued a decision reversing the PRRB. *See id.* at 2–28. The Administrator's reversal was based on two independent conclusions: (1) "[Deaconess] failed to show that there was a *bona fide* sale of its depreciable assets," and (2) "there was a continuity of control that resulted in the parties to the merger being related." *See id.* at 22, 25.

---

[12] After the two-day hearing, and following the submission of post-hearing briefs and exhibits, Deaconess filed a motion with the PRRB to reopen the administrative record "to correct an error in the calculation of the Provider's depreciable loss" under one of the two methods of calculation. *See id.* at 63. According to Deaconess's motion, under one of the methods of calculation, the loss should have been $20.8 million, rather than $19 million. *See id.* at 65. The Administrative Record indicates that the fiscal intermediary consented to the motion. *See id.* at 63.

In support of her conclusion regarding the absence of a *bona fide* sale, the Administrator made several findings. First, she found that "the history of [Deaconess]'s merger attempts does not reflect upon the value of its depreciable assets as such attempts were driven by matters other than sale price." *Id.* at 23. In this regard, the Administrator stated that Deaconess "was apparently not concerned about assessing whether the transaction was a 'fair exchange,'" but was instead "focused on transitioning its debts and assets to [Beth Israel] for sheer 'survivability' and to enable its organization to continue operations under a new name and company umbrella." *Id.* Second, the Administrator found that "[t]he absence of a calculation and determination of the value of [Deaconess]'s assets by [Deaconess] before commencement of the transaction, to ensure that such assets were transferred to [Beth Israel] in a fair exchange is a strong indication that [Deaconess] was not concerned with receiving reasonable consideration." *Id.* at 24. Third, the Administrator found that, based on the net-book value of Deaconess's land and depreciable assets ($212 million), "[Deaconess]'s depreciable assets were transferred for approximately 50 percent of their net book value," and "[t]his significant difference between the 'sale' price and the only contemporaneously determined valuation of the depreciable assets does not constitute reasonable consideration." *Id.* Furthermore, the Administrator stated that "[e]ven if one were to adopt [Deaconess]'s appraisal, conducted ten years after the transaction, as the best measure of the fair market value of [Deaconess]'s assets, the approximately $178,000,000 of depreciable assets and land were transferred for $108,000,000 or approximately 60 percent of the alleged fair market value." *Id.* at 24 n. 29.

On September 21 2009, Deaconess filed its Complaint in the instant case, challenging the Secretary's decision.[13] *See* Compl., ECF No. 1. The Complaint alleges a single cause of action,

---

[13] This case was reassigned to the current presiding judge on January 20, 2011.

pursuant to 42 U.S.C. § 1395oo, claiming that "the Secretary's denial of payment for Medicare's share of Deaconess's depreciation loss resulting from the statutory merger was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and unsupported by substantial evidence." *Id.* ¶ 73. The plaintiff therefore seeks reversal of the Secretary's decision, a declaration that the plaintiff is entitled to reimbursement, and an award of the plaintiff's depreciation loss, prejudgment interest, attorney's fees, and costs. *See id.* at 22–23. This action was stayed pending the D.C. Circuit's decision in *St. Luke's Hospital v. Sebelius*, No. 09-5352 (D.C. Cir. filed Oct. 20, 2009), because that decision "[would] impact issues of law raised in this proceeding." *See* Joint Mot. to Stay Proceedings at 1, ECF No. 13; Minute Order dated Feb. 12, 2010 (granting motion to stay). Following the *St. Luke's* decision, the stay was lifted, and the parties each filed cross-motions for summary judgment, which are now pending before the Court. For the reasons discussed below, the Court denies the plaintiff's motion for summary judgment and grants the defendant's cross-motion for summary judgment.

## II.   LEGAL STANDARD

"Review of CMS's decision is governed by 42 U.S.C. § 1395oo(f)(1), which incorporates the Administrative Procedure Act, 5 U.S.C. § 706." *Cent. Iowa Hosp. Corp. v. Sebelius*, 762 F. Supp. 2d 49, 53–54 (D.D.C. 2011). Accordingly, the scope of the Court's review is limited. The Court may not disturb the CMS's decision unless it is "unsupported by substantial evidence" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706. In deciding whether an agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Sentara-Hampton Gen. Hosp. v. Sullivan*, 980 F.2d 749, 755 (D.C. Cir. 1992) ("[E]ven if . . . other policies might better further the [agency's] stated objectives, we are compelled to accept the policies and rules adopted by the [agency] so long as they have a rational basis, are reasonably interpreted, and are consistent with the underlying statute."). "[A] reviewing court may not set aside an agency [decision] that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute," so long as the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 42–43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

Although the "substantial evidence" inquiry is a "subset" of the arbitrary and capricious standard, *see Sithe/Independence Power Partners, L.P. v. FERC*, 285 F.3d 1, 5 n.2 (D.C. Cir. 2002), it specifically "concerns support in the record for the agency action under review," *see Mem'l Hosp./Adair Cnty. Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 117 (D.C. Cir. 1987). "Substantial evidence 'is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Dickson v. Nat'l Transp. Safety Bd.*, 639 F.3d 539, 542 (D.C. Cir. 2011) (quoting *Chritton v. Nat'l Transp. Safety Bd.*, 888 F.2d 854, 856 (D.C. Cir. 1989)); *accord Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Under the substantial evidence test, the court must determine whether the agency could fairly and reasonably find the facts as it did." *Chritton*, 888 F.2d at 856 (internal quotation marks omitted). "Thus, a conclusion may be supported by substantial evidence even though a

14

plausible alternative interpretation of the evidence would support a contrary view." *Id.* (internal quotation marks omitted); *accord Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 523 (1981) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."). As a result, this Court may "reverse an agency's decision [for lack of substantial evidence] only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 704 (D.C. Cir. 2009) (internal quotation marks omitted).

## III.   DISCUSSION

At the outset, the Court notes that the plaintiff contends at length that the Secretary's interpretation of the Medicare regulations, and in particular the Secretary's interpretation that the Medicare depreciation reimbursement regulations require a statutory merger to satisfy *bona fide* sale requirements, is invalid. *See* Pl.'s Mem. at 27–52; *see also supra* Part I.A.3 (describing *bona fide* sale requirements). The D.C. Circuit, however, has repeatedly upheld the Secretary's interpretation of the Medicare depreciation reimbursement regulations. *See St. Luke's*, 611 F.3d at 906 ("[W]e uphold the Secretary's interpretation of 42 C.F.R. § 413.134(f) and (*l*), memorialized in PM A-00-76, because it is not plainly erroneous or inconsistent with the regulation." (internal quotation marks omitted)); *accord Cent. Iowa Hosp. Corp. v. Sebelius*, 466 F. App'x 6 (D.C. Cir. 2012); *Forsyth*, 639 F.3d at 537 ("We have previously upheld PM A-00-76's interpretation of subsection (*l*): A statutory merger will not give rise to a reimbursable loss unless the merger constitutes a bona fide sale and 'reasonable consideration is a required element of a *bona fide* sale.'" (quoting *St. Luke's*, 611 F.3d at 903–06)). The plaintiff acknowledges, as it must, that the D.C. Circuit's holding "that a statutory merger must satisfy *bona fide* sale criteria

defined by Secretary, is binding upon this Court."  Pl.'s Mem. at 2.  Hence, the plaintiff makes

clear that it only challenges the Secretary's interpretation in its briefing to "preserv[e] these

arguments for appeal."  *Id.*

Since the Court is bound by the holding in *St. Luke's*, the Court need only assess whether

the Secretary's determination—that the merger at issue did not satisfy the *bona fide* sale

requirements—was unsupported by substantial evidence or otherwise arbitrary and capricious.

As the Circuit has made clear, "the Administrator's finding that [a provider] did not exchange

reasonable consideration [is] an independent and sufficient ground for refusing [the plaintiff's]

requested reimbursement."  *Forsyth*, 639 F.3d at 539.  Thus, the Court will first discuss whether

the Secretary's determination regarding the lack of "reasonable consideration" was unsupported

by substantial evidence or otherwise arbitrary and capricious.

Before discussing the plaintiff's arguments, the Court must clarify certain definitional

aspects of the merger at issue in this case, as they relate to the concept of "reasonable

consideration."  It is uncontested that the lump-sum sales price for all of Deaconess's assets was

the assumption by Beth Israel of Deaconess's outstanding liabilities.  *See, e.g.*, Pl.'s Mem. at 48–

49 ("[I]n a non-profit merger, the purchase price is fixed at the amount of liabilities assumed by

the surviving entity on the date of the merger."); Def.'s Cross-Mot. for Summ. J. & Opp'n to

Pl.'s Mot. for Summ. J. ("Def.'s Opp'n") at 12, ECF No. 19.  It is also uncontested that the

amount of those liabilities was approximately $251 million.  *See* Pl.'s Facts ¶ 127; Def.'s Opp'n

at 1.  Thus, the two main issues regarding "reasonable consideration" that appear to be contested

are: (1) what the proper method is for allocating the sales prices across the assets to determine

the discrete sales price of the depreciable assets; and (2) what the proper measure is for the fair-

market value of the plaintiff's depreciable assets.  These definitional issues are important

because, as discussed above, the reasonableness of the consideration received for a given asset is determined primarily by comparing the asset's sales price (*i.e.*, the monetary consideration received for the asset) with its fair market value. *See, e.g.*, *St. Luke's*, 611 F.3d at 903–04 ("[A] large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a *bona fide* sale." (quoting PM A-00-76, at 3)).

As to the first issue, the plaintiff has taken conflicting positions. First, the plaintiff argues in its reply brief that the Secretary erred "by insisting that the purchase price should have first been allocated to monetary assets on a dollar-for-dollar basis, with the remainder allocated to fixed assets, including land and depreciable assets, on a proportional basis." *See* Pl.'s Reply in Supp. Mot. for Summ. J. & Opp'n to Def.'s Cross-Mot. for Summ. J. ("Pl.'s Reply") at 31, ECF No. 21. This method is known alternatively as the "cost approach," the "pro rata method," or the "APB-16 methodology."[14] *See id.* at 32 n.41; A.R. at 60; PM A-00-76, at 3–4. Despite the fact that the plaintiff takes issue with this methodology in its reply brief, the plaintiff explicitly *endorsed* this methodology in its opening brief, stating that it "is the most appropriate method to use," Pl.'s Mem. at 59 n.143, and that "it makes sense to use the method of calculating loss commonly called 'APB-16,'" Pl.'s Facts ¶ 122. The plaintiff attempts to brush aside this inconsistency, stating without explanation or citation to any authority that, while the cost approach is appropriate "for calculating *losses*, it is not the determinative methodology for determining whether the *consideration* received was reasonable." *See* Pl.'s Reply at 32 n.41 (emphasis in original).

---

[14] The term "APB-16" is "drawn from Accounting Principles Board Opinion 16, which has been endorsed in Medicare's publications." *See* Pl.'s Mem. at 59 n.143. As the defendant explains, the rationale behind this methodology is that "[b]y virtue of current assets, cash and cash equivalents, being just that—current—their stated value *is* their fair market value." *See* Def.'s Reply in Supp. Cross-Mot. for Summ. J. ("Def.'s Reply") at 10, ECF No. 25 (emphasis in original). Thus, under this methodology, the sales price is first allocated to current (or monetary) assets on a dollar-for-dollar basis, leaving the remainder of the sales price to be allocated across the fixed (including depreciable) assets on a pro-rata basis.

Even if the plaintiff's proposed distinction had any merit, which it does not,[15] the plaintiff's argument is foreclosed by PM A-00-76, which clearly states that "the cost approach is the only methodology that produces a discrete indication of the value for the individual assets of the business, and thus, is the approach that is used to allocate a lump sum sales price among the assets sold." *See* PM A-00-76, at 3–4 (citing 42 C.F.R. § 413.134(f)(2)(iv)); *see also id.* at 4 ("[I]n analyzing whether a *bona fide* sale has occurred, a review of the allocation of the sales price among the assets sold is appropriate."). The D.C. Circuit has explicitly upheld "the Secretary's interpretation of 42 C.F.R. § 413.134(f) and (*l*), memorialized in PM A-00-76." *St. Luke's*, 611 F.3d at 906. Thus, in line with the holding in *St. Luke's*, the Court holds that it was reasonable for the Secretary to use the cost approach in determining what portion of the sales price was to be allocated to the plaintiff's depreciable assets in deciding whether the plaintiff received "reasonable consideration" for those assets. As to the second issue regarding whether the net-book value or the appraised value is the appropriate measure of fair-market value, the Court need not decide this question because, as discussed further below, the Secretary analyzed the reasonableness of the consideration received for the plaintiff's depreciable assets using both measures. *See* A.R. at 24 & n.29.

With these definitional matters resolved, the Court now turns to the plaintiff's arguments regarding reasonable consideration. Generally, the plaintiff argues that "the Secretary's finding of a lack of reasonable consideration is arbitrary and capricious and not supported by substantial evidence." Pl.'s Mem. at 55. In this regard, the plaintiff contends that "[i]n contrast to the 'large disparity' at issue in . . . *St. Luke's*, there is a comparably small difference between the sales

---

[15] It would make little sense to calculate the loss on depreciable assets using the cost approach, but then use some other methodology to determine the sales price of those same assets for the purpose of evaluating reasonable consideration. Indeed, the loss taken on depreciable assets is part and parcel to the sales price allocated to those assets because the loss on a given asset is simply the net-book value minus the sales price. *See, e.g.*, *St. Luke's*, 611 F.3d at 901–02.

price and the fair market value of the assets in the Deaconess merger." *Id.*  Indeed, the plaintiff

argues that the difference between the sales price and fair-market value of its assets "becomes

extremely minimal in light of the fact that Deaconess's difficult financial position meant that

hardly any of its assets were cash, and in light of the context and risks of the merger, as

evidenced in the record." *Id.*  The plaintiff elaborates on these latter arguments, contending first

that the correct measure of the fair-market value of its assets is the 2007 CBIZ retrospective

appraisal, rather than the net-book value.  *See id.* at 55 n.134.  Based on that appraisal, the

plaintiff argues that "the sales price was over 78% of the fair market value of" Deaconess's

assets.  *Id.* at 55 (emphasis omitted) (citing A.R. at 3159).[16]  The plaintiff also contends that its

own appraisal, which it relies on to make its other arguments, was flawed because "substantial

risks further decreased the value of Deaconess's assets." *Id.* at 58.  According to the plaintiff,

such risks included "risks related to the costs of integration, risks that the expected increased

revenues would not materialize, risks associated with bearing Deaconess's operating costs, risks

of worsened bond ratings, and risks that cost savings would not be realized." *Id.*

　　　None of these arguments demonstrates that the Secretary's decision was unsupported by

substantial evidence or otherwise arbitrary and capricious.  First, although the plaintiff contends

that "the sales price was over 78% of the fair market value of" Deaconess's assets, *id.* at 55

(emphasis omitted), that calculation does not use the cost approach.  Rather, it allocates the

lump-sum sales price across all assets equally.  Assuming *arguendo* that the 2007 CBIZ

retrospective appraisal is the appropriate measure of fair-market value, the plaintiff's depreciable

assets had a fair-market value of approximately $178,250,000.  *See* A.R. at 150.  The CBIZ

appraisal, however, did not purport to estimate the fair-market value of the plaintiff's monetary

---

[16] The plaintiff arrives at this figure by dividing the sales price for the entire enterprise, $251,374,000 by the total fair-market value of Deaconess's assets, $321,378,000 (*i.e.*, net-book value of monetary assets plus appraised value of fixed assets).  *See* Pl.'s Mem. at 55 n.134.

assets (including cash and cash equivalents), whose fair-market value the parties agree was approximately $143 million.  *See id.* at 24; Pl.'s Facts ¶ 126.  Using the cost approach, the first $143 million of the $251 million sales price is allocated on a dollar-for-dollar basis to the monetary assets, leaving $108 million to be allocated to the fixed (including depreciable) assets. Thus, comparing the sales price of the depreciable assets ($108,000,000) against the appraised fair-market value of those assets ($178,250,000), the plaintiff only received approximately 61 cents on the dollar for its depreciable assets, not 78 cents on the dollar as the plaintiff contends. Although this disparity is not as large as that encountered in some cases, *see, e.g.*, *Forsyth*, 639 F.3d at 538 (30 cents on the dollar for depreciable assets), other courts have found that even smaller disparities were sufficiently large to uphold the Secretary's determination that reasonable consideration had not been received, *see, e.g.*, *Whidden Mem'l Hosp. v. Sebelius*, 828 F. Supp. 2d 218, 227 (D.D.C. 2011) ("The Administrator did not act arbitrarily or capriciously in finding that 70% of the fair market value did not constitute reasonable consideration."); *Jeanes Hosp. v. Sebelius*, 747 F. Supp. 2d 416, 425 (E.D. Pa. 2010) (upholding "the Administrator's determination that one would not expect a party earnestly negotiating in its own self-interest to agree to" an exchange "amount[ing] to approximately eighty-one (81) cents on the dollar"), *aff'd*, 448 F. App'x 202 (3d Cir. 2011).  The Court likewise concludes that the Secretary's conclusion that 60 cents on the dollar was not reasonable consideration was reasonable and supported by substantial evidence.

Additionally, although the plaintiff contends that "substantial risks further decreased the value of Deaconess's assets," Pl.'s Mem. at 58, the plaintiff "has provided no evidence as to *how* the Administrator ought to have discounted these assets," *see Whidden*, 828 F. Supp. 2d at 227 (emphasis in original).  The closest the plaintiff comes to doing so is by pointing to a $71 million

operating loss suffered by BIDMC in 1998 and a $69 million operating loss in 1999.  *See* Pl.'s

Mem. at 58; A.R. at 1929.  Yet, the plaintiff does not explain how the Administrator (or this

Court) is to translate a general operating loss into a discount on the value of a specific class of

assets.  Indeed, the plaintiff admitted in its final position paper submitted to the PRRB that "[i]t

is true that Medicare chooses not to consider these forms of value for allocation purposes

(perhaps given the difficulty of quantifying some of these risks)."  *See* A.R. at 1929.  "The

burden of proof to show that a bona fide sale occurred rest[s] on [the claimant of the loss]."

*Forsyth*, 639 F.3d at 539 (citing 42 U.S.C. § 1395g(a)).  Since the plaintiff did not (and has not)

put forth any evidence regarding how the Administrator should have discounted the plaintiff's

depreciable assets in light of "substantial risks" surrounding the merger, the Court concludes that

the Secretary's choice not to consider or apply such a discount was reasonable.

　　　The plaintiff also puts forth other arguments challenging the Secretary's conclusion

regarding "reasonable consideration."  For example, the plaintiff contends that "the true value of

the Deaconess assets was less than the appraised amount," primarily because "the vast majority

of the assets were not cash or cash equivalents that Deaconess had available for immediate use"

and "Deaconess's cash assets comprise[d] only 1.17% of the total monetary assets that were

transferred to BIDMC in the merger."  *See* Pl.'s Mem. at 56–57.  The plaintiff argues that "[t]his

extremely low percentage demonstrates just how impaired the Deaconess assets were" and

supports the conclusion that "the true disparity between Deaconess's assets and its liabilities is

nearly non-existent."  *Id.* at 57.  The plaintiff also contends that "the context of this specific

transaction" such as the plaintiff's "extensive competitive bidding for its assets" and "the distinct

bargaining disadvantage" that it faced in light of its "increasingly grim financial picture,"

supports a finding of reasonable consideration.  *See id.* at 57–58.

First, the plaintiff failed to submit any evidence to the Administrator that its monetary assets should be discounted because they had limited immediate use.  Indeed, the plaintiff did not even raise this non-liquidity argument in its final position paper before the PRRB or in its comments to the Administrator, let alone specify how and to what extent the monetary assets should be discounted because they had limited immediate use.  *See generally* A.R. at 32–37 (plaintiff's comments to the Administrator); 1861–932 (plaintiff's final position paper).  Thus, it was not arbitrary and capricious for the Secretary to decide not to discount the plaintiff's monetary assets on that basis in making a determination regarding reasonable consideration.  *See, e.g.*, *Forsyth*, 639 F.3d at 539.  Additionally, even assuming that "a plausible alternative interpretation of the evidence would support" either of the above arguments, that fact alone would be insufficient to compel the conclusion that the Secretary's decision was unsupported by substantial evidence.  *See Chritton*, 888 F.2d at 856 (internal quotation marks omitted).

In any event, the Administrator *did* consider the "context of this specific transaction," *see* Pl.'s Mem. at 57, and she found that Deaconess's "failed and successful negotiations involved a multitude of other non-economic factors" and "were driven by matters other than sale price," *see* A.R. at 22–23.  The Administrator also reviewed several pieces of evidence in the record indicating that Deaconess "focused on transitioning its debts and assets to [Beth Israel] for sheer 'survivability' and to enable its organization to continue operations under a new name and company umbrella," rather than focusing on seeking fair-market value or reasonable consideration in exchange for its assets.  *See id.* at 23 &nn. 27–28.  Indeed, although the plaintiff argues that the merger with Beth Israel "was the best deal [Deaconess] could get," Pl.'s Reply at 25, that is beside the point in the context of Medicare reimbursement.  The Secretary's regulations require a Medicare provider to "seek[] fair market value for the assets given," *see* PM

A-00-76, at 3, and merely securing the best deal a provider can obtain does not compel the conclusion that the result of that deal was a *bona fide* sale—particularly if the provider is motivated by non-economic factors, *see* A.R. at 22 (finding that Deaconess's merger negotiations "involved a multitude of other non-economic factors that were not related to the disposition of its asset for the best price").  The purpose of Medicare reimbursement is not for taxpayers to subsidize non-profit providers seeking survival in an increasingly competitive health-care marketplace.  If a non-profit provider, such as the plaintiff, accepts a less-than-reasonable financial deal to ensure its "survivability," that is the provider's prerogative, but such sweetheart deals do not entitle the provider to further depreciation reimbursement because they are "not indicative of parties engaged in self-interested bargaining with a focus on maximizing financial compensation." *Forsyth Mem'l Hosp., Inc. v. Sebelius*, 667 F. Supp. 2d 143, 151 (D.D.C. 2009), *aff'd*, 639 F.3d 534 (D.C. Cir. 2011).  This may mean, as the plaintiff laments, that "[t]he Secretary's current interpretation of the regulation is essentially impossible to meet," *see* Pl.'s Mem. at 48, but that is a grievance with the statutory purposes of the Medicare reimbursement regime, which this Court has neither the institutional competency nor the power to resolve.

The evidence cited in the Secretary's decision regarding the plaintiff's non-economic motivations for seeking a merger, in addition to the large disparity (60 cents on the dollar) between the sales price and fair-market value of the plaintiff's depreciable assets, amply support the Secretary's conclusion that the plaintiff did not receive reasonable consideration for its depreciable assets.

**IV.     CONCLUSION**

Therefore, for the reasons discussed above, the Court concludes that the Secretary's decision regarding the lack of reasonable consideration received by the plaintiff was supported by substantial evidence and was not otherwise arbitrary and capricious.  Since "the Administrator's finding that [a provider] did not exchange reasonable consideration [is] an independent and sufficient ground for refusing [the plaintiff's] requested reimbursement," *Forsyth*, 639 F.3d at 539, the Court need not discuss any other aspect of the Secretary's decision in order to grant summary judgment to the defendant.  For the same reasons, the Court denies the plaintiff's motion for summary judgment.

An appropriate Order accompanies this Memorandum Opinion.

Date: April 29, 2013

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge